658 So.2d 166 (1995)
Joseph Nicholas ROBICHAUD, Appellant,
v.
STATE of Florida, Appellee.
No. 94-01450.
District Court of Appeal of Florida, Second District.
July 19, 1995.
*167 James Marion Moorman, Public Defender and Timothy J. Ferreri, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee and Helene S. Parnes, Asst. Atty. Gen., Tampa, for appellee.
CAMPBELL, Judge.
Appellant, convicted of possession of cocaine, delivery of cocaine, trafficking in cocaine and conspiracy to traffic in cocaine, argues on appeal that he was entrapped and that his convictions should accordingly be reversed. We agree because we conclude that under the subjective test for entrapment announced in Munoz v. State, 629 So.2d 90 (Fla. 1993), and set forth in section 777.201, Florida Statutes (1993), appellant met his burden of proving by a preponderance of the evidence that he was induced by the officers to commit the offenses and that he was not predisposed to do so. We conclude that appellant was entrapped as a matter of law and that the court erred in submitting the issue to the jury.
The issue of entrapment was presented to the court via a motion to dismiss prior to trial. The court concluded that there had been no showing of inducement and allowed the issue to go to the jury. Although instructed on the issue, the jury was not persuaded that appellant had been entrapped and convicted appellant of the charged offenses.
Appellant was convicted of his drug offenses following three cocaine buys that he arranged. Detective Debord had received an anonymous telephone tip from a female who lived in the trailer park where appellant lived. She complained generally of drug activity in the park, but did not identify appellant. Debord contacted a confidential informant (CI) he knew in the park. The CI was an older man who had supplied reliable information in the past. The detectives rated him as a "10" in terms of reliability. The CI was not monitored or supervised in any way during his interactions with appellant. Appellant was not identified or targeted by either the CI or law enforcement until the CI met appellant at a Super Bowl party and asked appellant if he could get him some cocaine. Appellant said no, and the CI explained that he needed the drugs to alleviate pain he suffered from cancer and chemotherapy treatments. Appellant was living in Anthony Sansony's trailer at that point. Since it was a very small trailer, appellant was sleeping on the couch. Appellant was still working at that point, unloading furniture from trucks.
According to appellant, the CI kept coming over to Sansony's trailer, "bumming" cigarettes and beer. When the CI's female roommate moved out, the CI approached appellant and asked him to move in with him since his trailer was much larger and the CI needed the rent money. Appellant agreed to move in with the CI and agreed to pay $65 per week in rent. Shortly after moving in, appellant hurt his back lifting a piano and could not work. He fell behind on his rent payments to the CI. According to appellant, the CI told him that he had Mafia connections *168 in Las Vegas where the CI had been a bail bondsman. The CI repeatedly referred to "his boys" as being "family" who would "take care of him." The CI explained that he received money from "his boys" for past services. Given the fact that the CI frequently placed bets over the telephone, appellant believed the Mafia story. The CI's "boys" were, in actuality, undercover detectives Debord and Kennedy.
After appellant had been out of work for several weeks, his former roommate, Sansony, told him that the CI had told Sansony that the CI was mad at appellant because of the back rent and that the CI had told Sansony that the CI's "boys" were going to come by and "take care of" appellant that afternoon. When appellant went to see the CI about this, the CI said he was tired of appellant laying around on his "duff" and that "his boys weren't going to put up with me mooching off of him, that they take care of their family and that they'd be coming by to talk to me that afternoon. And he said that he had already stopped them once from coming and I told him I knew somebody who could get him some cocaine. That's the only reason they didn't come before that." (R 386). Appellant then replied that he did not know anyone who sold cocaine. The CI responded that he would take a week off the rent if appellant would get him some cocaine for medicinal purposes. Appellant then called his friend from a couple of years ago, Dowling, who appellant knew had used cocaine before and thought could probably get him some.
Appellant called Dowling and arranged for the first buy to occur at a bar on Dale Mabry in Tampa. Shortly after the first buy was consummated, the CI threw appellant out of his trailer on the grounds that appellant "could not do these boys like this." (R 401). Apparently, the "boys" wanted to do another drug buy, but appellant refused because the first deal had not occurred as planned. After the CI threw him out, appellant moved back in with Sansony. Soon afterwards, the "boys" called appellant from the CI's trailer offering him a job as a security guard and a place to live at a compound in Lakeland where they said they stored stolen construction equipment. Appellant agreed, but the "boys" added a stipulation: Appellant would have to arrange another cocaine deal for them. They explained that their regular supplier had been busted and they needed cocaine. Appellant told them he'd have to think about it. After talking to Sansony, appellant decided to do it, explaining that he wanted the job and the place to live. The second and third drug buys occurred at another bar in Tampa.
For each of the three drug buys, the undercover agents drove appellant to the location. For the last deal, which was for a trafficking amount, appellant had to talk Dowling into doing it by explaining that this was his chance to get a place to stay and a job. Appellant said that he did the first deal because of the threats of physical harm and to help his friend, the CI. He did the second and third deals to secure the job and place to live offered by the "boys."
We conclude that these facts support appellant's position that he was entrapped as a matter of law. Under Munoz, the test for entrapment is as follows: (1) "[W]hether an agent of the government induced the accused to commit the offense charged;" (2) "whether the accused was predisposed to commit the offense charged; that is, whether the accused was awaiting any propitious opportunity or was ready and willing, without persuasion, to commit the offense;" and (3) "whether the entrapment evaluation should be submitted to a jury." 629 So.2d at 99-100.
On the first question, appellant must establish by a preponderance of the evidence that the government agent induced him to commit the offenses. Since the CI was not available to testify and the CI was not monitored, we have no way of knowing what the CI really told appellant. The only evidence of what the CI told appellant is contained in appellant's testimony and in Sansony's testimony corroborating the CI's Mafia story.
Appellant's and Sansony's testimony indicated that the CI induced appellant to participate in the first drug buy by appealing to his sympathy for a sick friend and threatening him that "his boys" from the Mafia would "take care of him" if he didn't. Appellant *169 took this to mean that "the boys" would break his legs or his arms or kill him. To induce appellant to participate in the second and third drug buys, the undercover agents told appellant that they could provide him a job and a place to live if he would get them some more cocaine. This offer was made only after the CI kicked appellant out of the CI's trailer and appellant had lost his job unloading furniture due to a back injury. The security guard position would require no manual labor.
In considering whether these ploys were sufficient inducement to conclude that appellant was entrapped, we can conceive of no greater inducements than these: First, a threat of severe bodily harm combined with an appeal to mercy, and, second, an offer, made to a man who just lost his place to live (because the government agent kicked him out) of not only a place to live, but a job as well, only if appellant would do more drug deals for them. To further sweeten the offer, the job was one that would not require appellant to use his injured back. Essentially then, government agents threatened appellant with bodily harm, took away his residence and then, when appellant was jobless and virtually homeless, offered him a job and a residence on the condition that he obtain cocaine for them. We, accordingly, answer the first question in the affirmative and find that there can be no question here that the government agents induced appellant to commit the offenses.
Turning to the second question, whether appellant was predisposed to commit the offenses, we conclude that the answer is no. Detective Debord received no information that appellant was involved in the drug dealing in the trailer park. The anonymous phone call did not target anyone. Debord did not receive any information about appellant until the CI mentioned him to Debord. Appellant had no prior felonies, and the testimony at trial did not reveal any prior drug offenses. The only evidence involving appellant and drugs was appellant's admission that when he lived with Dowling several years before, he and Dowling had used cocaine together. This, however, was not known to Debord when appellant was targeted by the CI for investigation. This case is like State v. Ramos, 632 So.2d 1078 (Fla. 3d DCA 1994), where the court quoted the Munoz court, finding that there was "`no history, information, or intelligence known to law enforcement of any involvement by [Diaz] in any narcotics activities or drug `rip-offs' before the confidential informant brought [Diaz] into the scheme.'" 632 So.2d at 1079. (Diaz was a co-defendant in Ramos.) We conclude then that appellant established that he had no predisposition; the state was unable to rebut this evidence beyond a reasonable doubt. See Herrera v. State, 594 So.2d 275 (Fla. 1992).
The third question is whether the entrapment evaluation should have been submitted to the jury. We conclude that the trial court here should have made the determination as a matter of law. Appellant has conclusively shown that government agents induced him to act and that he was not predisposed to commit the offenses. See Munoz. Under these circumstances, the issue of entrapment should not have been submitted to a jury.
Having found that appellant was entrapped as a matter of law, we reverse and vacate appellant's convictions. Given our determination on the entrapment issue, we decline to discuss appellant's second point since, in light of our reversal, that point would be moot.
FRANK, A.C.J., and WHATLEY, J., concur.